DOMBROWSKI ET AL. *v.* PFISTER, CHAIRMAN, JOINT LEGISLATIVE COMMITTEE ON UN-AMERICAN ACTIVITIES OF THE LOUISIANA LEGISLATURE, ET AL.

No. 52.  Argued January 25, 1965.—Decided April 26, 1965.

480

*Leon Hubert* and *Arthur Kinoy* argued the cause for appellants. With them on the brief were *William M. Kunstler, Michael J. Kunstler* and *A. P. Tureaud.*

*John E. Jackson, Jr.,* Assistant Attorney General of Louisiana, and *Jack N. Rogers* argued the cause for appellees. With them on the brief for appellees Pfister et al. were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *Dorothy D. Wolbrette,* Assistant Attorney General. With *Mr. Rogers* on the brief for appellee Joint Legislative Committee on Un-American Activities was *Robert H. Reiter. Mr. Reiter* also filed a brief for appellee Davis. Appellee *Jim Garrison* filed a brief *pro se.*

Briefs of *amici curiae,* urging reversal, were filed by *Jack Greenberg, Derrick A. Bell, Jr.,* and *Jay H. Topkis* for the NAACP Legal Defense & Educational Fund; by *Louis Lusky* and *Melvin L. Wulf* for the American Civil Liberties Union et al.; and by *Ernest Goodman* and *David Rein* for the National Lawyers Guild.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellants filed a complaint in the District Court for the Eastern District of Louisiana, invoking the Civil

Rights Act, Rev. Stat. § 1979, 42 U. S. C. § 1983 (1958 ed.), and seeking declaratory relief and an injunction restraining appellees—the Governor, police and law enforcement officers, and the Chairman of the Legislative Joint Committee on Un-American Activities in Louisiana—from prosecuting or threatening to prosecute appellants for alleged violations of the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law.[1] Appellant Southern Conference Educational Fund, Inc. (SCEF), is active in fostering civil rights for Negroes in Louisiana and other States of the South. Appellant Dombrowski is its Executive Director; intervenor Smith, its Treasurer; and intervenor Waltzer, Smith's law partner and an attorney for SCEF. The complaint alleges that the statutes on their face violate the First and Fourteenth Amendment guarantees securing freedom of expression, because overbreadth makes them susceptible of sweeping and improper application abridging those rights. Supported by affidavits and a written offer of proof, the complaint further alleges that the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.

A three-judge district court, convened pursuant to 28 U. S. C. § 2281 (1958 ed.), dismissed the complaint, one judge dissenting, "for failure to state a claim upon which relief can be granted." 227 F. Supp. 556, 564. The ma-

---

[1] The Subversive Activities and Communist Control Law is La. Rev. Stat. §§ 14:358 through 14:374 (Cum. Supp. 1962). The Communist Propaganda Control Law is La. Rev. Stat. §§ 14:390 through 14:390.8 (Cum. Supp. 1962).

jority were of the view that the allegations, conceded to raise serious constitutional issues, did not present a case of threatened irreparable injury to federal rights which warranted cutting short the normal adjudication of constitutional defenses in the course of state criminal prosecutions; rather, the majority held, this was an appropriate case for abstention, since a possible narrowing construction by the state courts would avoid unnecessary decision of constitutional questions. In accordance with this view the court withdrew its initial determination that the statutes were not unconstitutional on their face. 227 F. Supp., at 562–563. Postponement of consideration of the federal issues until state prosecution and possible review here of adverse state determination was thought to be especially appropriate since the statutes concerned the State's "basic right of self-preservation" and the threatened prosecution was "imbued . . . with an aura of sedition or treason or acts designed to substitute a different form of local government by other than lawful means . . ."; federal court interference with enforcement of such statutes "truly . . . would be a massive emasculation of the last vestige of the dignity of sovereignty." 227 F. Supp., at 559, 560. We noted probable jurisdiction in order to resolve a seeming conflict with our later decision in *Baggett* v. *Bullitt,* 377 U. S. 360, and to settle important questions concerning federal injunctions against state criminal prosecutions threatening constitutionally protected expression. 377 U. S. 976. We reverse.

I.

In *Ex parte Young,* 209 U. S. 123, the fountainhead of federal injunctions against state prosecutions, the Court characterized the power and its proper exercise in broad terms: it would be justified where state officers ". . . threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against par-

ties affected an unconstitutional act, violating the Federal Constitution . . . ." 209 U. S., at 156. Since that decision, however, considerations of federalism have tempered the exercise of equitable power,[2] for the Court has recognized that federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application

---

[2] 28 U. S. C. § 2283 (1958 ed.) provides that:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The District Court did not suggest that this statute denied power to issue the injunctions sought. This statute and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted. See *Ex parte Young, supra.* See generally Warren, Federal and State Court Interference, 43 Harv. L. Rev. 345, 366–378 (1930); Note, Federal Power to Enjoin State Court Proceedings, 74 Harv. L. Rev. 726, 728–729 (1961). Since the grand jury was not convened and indictments were not obtained until after the filing of the complaint, which sought interlocutory as well as permanent relief, no state "proceedings" were pending within the intendment of § 2283. To hold otherwise would mean that any threat of prosecution sufficient to justify equitable intervention would also be a "proceeding" for § 2283. Nor are the subsequently obtained indictments "proceedings" against which injunctive relief is precluded by § 2283. The indictments were obtained only because the District Court erroneously dismissed the complaint and dissolved the temporary restraining order issued by Judge Wisdom in aid of the jurisdiction of the District Court properly invoked by the complaint. We therefore find it unnecessary to resolve the question whether suits under 42 U. S. C. § 1983 (1958 ed.) come under the "expressly authorized" exception to § 2283. Compare *Cooper* v. *Hutchinson,* 184 F. 2d 119, 124 (C. A. 3d Cir. 1950), with *Smith* v. *Village of Lansing,* 241 F. 2d 856, 859 (C. A. 7th Cir. 1957). See Note, 74 Harv. L. Rev. 726, 738 (1961).

of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings. In *Douglas* v. *City of Jeannette,* 319 U. S. 157, for example, the Court upheld a district court's refusal to enjoin application of a city ordinance to religious solicitation, even though the ordinance was that very day held unconstitutional as so applied on review of a criminal conviction under it. *Murdock* v. *Pennsylvania,* 319 U. S. 105. Since injunctive relief looks to the future, and it was not alleged that Pennsylvania courts and prosecutors would fail to respect the *Murdock* ruling, the Court found nothing to justify an injunction. And in a variety of other contexts the Court has found no special circumstances to warrant cutting short the normal adjudication of constitutional defenses in the course of a criminal prosecution.[3] In such cases it does not appear that the plaintiffs "have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court." *Douglas* v. *City of Jeannette, supra,* at 164.

But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights.

---

[3] See, *e. g., Beal* v. *Missouri Pac. R. Co.,* 312 U. S. 45 (mere threat of single prosecution); *Spielman Motor Sales Co., Inc.* v. *Dodge,* 295 U. S. 89 (same); *Watson* v. *Buck,* 313 U. S. 387 (no irreparable injury or constitutional infirmity in statute); *Fenner* v. *Boykin,* 271 U. S. 240 (same). It is difficult to think of a case in which an accused could properly bring a state prosecution to a halt while a federal court decides his claim that certain evidence is rendered inadmissible by the Fourteenth Amendment. Cf. *Cleary* v. *Bolger,* 371 U. S. 392; *Stefanelli* v. *Minard,* 342 U. S. 117.

They suggest that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury.

A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. See, e. g., Smith v. California, 361 U. S. 147. When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. See Baggett v. Bullitt, supra, at 379. For "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions. . . ." NAACP v. Button, 371 U. S. 415, 433. Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser. Cf. Garrison v. Louisiana, 379 U. S. 64, 74–75. For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. Thornhill v. Alabama, 310 U. S. 88, 97–98; NAACP v. Button, supra, at 432–433; cf. Aptheker v. Secretary of State, 378 U. S. 500, 515–517; United States v. Raines, 362 U. S. 17, 21–22. We have fashioned this exception to the usual rules governing standing, see United States v. Raines, supra, because of

the ". . . danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *NAACP* v. *Button, supra,* at 433. If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. Cf. *Ex parte Young, supra,* at 147–148. By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure. See *NAACP* v. *Button, supra,* at 432–433; cf. *Baggett* v. *Bullitt, supra,* at 378–379; *Bush* v. *Orleans School Board,* 194 F. Supp. 182, 185, affirmed *sub nom. Tugwell* v. *Bush,* 367 U. S. 907; *Gremillion* v. *United States,* 368 U. S. 11.

Appellants' allegations and offers of proof outline the chilling effect on free expression of prosecutions initiated and threatened in this case. Early in October 1963 appellant Dombrowski and intervenors Smith and Waltzer were arrested by Louisiana state and local police and charged with violations of the two statutes. Their offices were raided and their files and records seized.[4] Later in October a state judge quashed the

---

[4] The circumstances of the arrests are set forth in Judge Wisdom's dissenting opinion:

"At gunpoint their homes and offices were raided and ransacked by police officers and trustees from the House of Detention acting under the direct supervision of the staff director and the counsel for the State Un-American Activities Committee. The home and office of

arrest warrants as not based on probable cause, and discharged the appellants.  Subsequently, the court granted a motion to suppress the seized evidence on the ground that the raid was illegal.  Louisiana officials continued, however, to threaten prosecution of the appellants, who thereupon filed this action in November.  Shortly after the three-judge court was convened, a grand jury was summoned in the Parish of Orleans to hear evidence looking to indictments of the individual appellants.  On appellants' application Judge Wisdom issued a temporary restraining order against prosecutions pending hearing and decision of the case in the District Court.  Following a hearing the District Court, over Judge Wisdom's dissent, dissolved the temporary restraining order and, at the same time, handed down an order dismissing the complaint.  Thereafter the grand jury returned indictments under the Subversive Activities and Communist Control Law against the individual appellants.[5]

These events, together with repeated announcements by appellees that the appellant organization is a subversive or Communist-front organization, whose members must register or be prosecuted under the Louisiana statutes, have, appellants allege, frightened off potential members and contributors.  Cf. *Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123.  Seizures of documents and records have paralyzed operations and threatened exposure of the

the director of Southern Conference Educational Fund were also raided.  Among the dangerous articles removed was Thoreau's Journal.  A truckload of files, membership lists, subscription lists to SCEF's newspaper, correspondence, and records were removed from SCEF's office, destroying its capacity to function.  At the time of the arrests, Mr. Pfister, Chairman of the Committee, announced to the press that the raids and arrest resulted from 'racial agitation.' "
227 F. Supp., at 573.

[5] Prosecution under these indictments is awaiting decision of this case.

identity of adherents to a locally unpopular cause. See *NAACP* v. *Alabama,* 357 U. S. 449. Although the particular seizure has been quashed in the state courts, the continuing threat of prosecution portends further arrests and seizures, some of which may be upheld and all of which will cause the organization inconvenience or worse. In *Freedman* v. *Maryland, ante,* p. 51, we struck down a motion picture censorship statute solely because the regulatory scheme did not sufficiently assure exhibitors a prompt judicial resolution of First Amendment claims. The interest in immediate resolution of such claims is surely no less where criminal prosecutions are threatened under statutes allegedly overbroad and seriously inhibiting the exercise of protected freedoms. Not only does the complaint allege far more than an "injury other than that incidental to every criminal proceeding brought lawfully and in good faith," but appellants allege threats to enforce statutory provisions other than those under which indictments have been brought. Since there is no immediate prospect of a final state adjudication as to those other sections—if, indeed, there is any certainty that prosecution of the pending indictments will resolve all constitutional issues presented—a series of state criminal prosecutions will not provide satisfactory resolution of constitutional issues.

It follows that the District Court erred in holding that the complaint fails to allege sufficient irreparable injury to justify equitable relief.

The District Court also erred in holding that it should abstain pending authoritative interpretation of the statutes in the state courts, which might hold that they did not apply to SCEF, or that they were unconstitutional as applied to SCEF. We hold the abstention doctrine is inappropriate for cases such as the present one where, unlike *Douglas* v. *City of Jeannette,* statutes are justifi-

ably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities.

First, appellants have attacked the good faith of the appellees in enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke, criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities. If these allegations state a claim under the Civil Rights Act, 42 U. S. C. § 1983, as we believe they do, see *Beauregard* v. *Wingard*, 230 F. Supp. 167 (D. C. S. D. Calif. 1964); *Bargainer* v. *Michal*, 233 F. Supp. 270 (D. C. N. D. Ohio 1964), the interpretation ultimately put on the statutes by the state courts is irrelevant. For an interpretation rendering the statute inapplicable to SCEF would merely mean that appellants might ultimately prevail in the state courts. It would not alter the impropriety of appellees' invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities, as appellees allegedly are doing and plan to continue to do.

Second, appellants have challenged the statutes as overly broad and vague regulations of expression. We have already seen that where, as here, prosecutions are actually threatened, this challenge, if not clearly frivolous, will establish the threat of irreparable injury required by traditional doctrines of equity. We believe that in this case the same reasons preclude denial of equitable relief pending an acceptable narrowing construction. In considering whether injunctive relief should be granted, a federal district court should consider a statute as of the time its jurisdiction is invoked, rather than some hypothetical future date. The area of proscribed conduct will be adequately defined and the deterrent effect of the statute contained within constitutional limits only by authoritative constructions sufficiently illuminating the

contours of an otherwise vague prohibition. As we observed in *Baggett* v. *Bullitt, supra,* at 378, this cannot be satisfactorily done through a series of criminal prosecutions, dealing as they inevitably must with only a narrow portion of the prohibition at any one time, and not contributing materially to articulation of the statutory standard. We believe that those affected by a statute are entitled to be free of the burdens of defending prosecutions, however expeditious, aimed at hammering out the structure of the statute piecemeal, with no likelihood of obviating similar uncertainty for others. Here, no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution, and appellants are entitled to an injunction. The State must, if it is to invoke the statutes after injunctive relief has been sought, assume the burden of obtaining a permissible narrow construction in a noncriminal proceeding [6] before it may seek modification of the injunction to permit future prosecutions.[7]

On this view of the "vagueness" doctrine, it is readily apparent that abstention serves no legitimate purpose where a statute regulating speech is properly attacked on its face, and where, as here, the conduct charged in the indictments is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not the sort of "hard-

---

[6] Thirty-seven States, including Louisiana, have adopted the Uniform Declaratory Judgments Act. The Louisiana version, La. Civ. Proc. Code Ann., 1960, Arts. 1871–1883, abolishes the former requirement that there be no other adequate remedy.

[7] Our cases indicate that once an acceptable limiting construction is obtained, it may be applied to conduct occurring prior to the construction, see *Poulos* v. *New Hampshire,* 345 U. S. 395; *Cox* v. *New Hampshire,* 312 U. S. 569; *Winters* v. *New York,* 333 U. S. 507, provided such application affords fair warning to the defendants, see *Lanzetta* v. *New Jersey,* 306 U. S. 451; cf. *Harrison* v. *NAACP,* 360 U. S. 167, 179.

core" conduct that would obviously be prohibited under any construction. In these circumstances, to abstain is to subject those affected to the uncertainties and vagaries of criminal prosecution, whereas the reasons for the vagueness doctrine in the area of expression demand no less than freedom from prosecution prior to a construction adequate to save the statute. In such cases, abstention is at war with the purposes of the vagueness doctrine, which demands appropriate federal relief regardless of the prospects for expeditious determination of state criminal prosecutions. Although we hold today that appellants' allegations of threats to prosecute, if upheld, dictate appropriate equitable relief without awaiting declaratory judgments in the state courts, the settled rule of our cases is that district courts retain power to modify injunctions in light of changed circumstances. *System Federation* v. *Wright,* 364 U. S. 642; *Chrysler Corp.* v. *United States,* 316 U. S. 556; *United States* v. *Swift & Co.,* 286 U. S. 106. Our view of the proper operation of the vagueness doctrine does not preclude district courts from modifying injunctions to permit prosecutions in light of subsequent state court interpretation clarifying the application of a statute to particular conduct.

We conclude that on the allegations of the complaint, if true, abstention and the denial of injunctive relief may well result in the denial of any effective safeguards against the loss of protected freedoms of expression, and cannot be justified.

## II.

Each of the individual appellants was indicted for violating § 364 (7) [8] of the Subversive Activities and Communist Control Law by failing to register as a member of

---

[8] Section 364 (7) provides: "It shall be a felony for any person knowingly and wilfully to . . . [f]ail to register as required in R. S. 14:360 or to make any registration which contains any material false statement or omission."

a Communist-front organization. Smith and Waltzer were indicted for failing to register as members "of a Communist front organization known as the National Lawyers Guild, which said organization has been cited by committees and sub-committees of the United States Congress as a Communist front organization . . . ." Dombrowski and Smith were indicted for failing to register as members of "a Communist front organization known as the Southern Conference Educational Fund, which said organization is essentially the same as the Southern Conference for Human Welfare, which said Southern Conference for Human Welfare [has] . . . been cited by the committees of the United States Congress as a Communist front organization . . . ." Dombrowski and Smith were also indicted for violating § 364 (4),[9] by acting as Executive Director and Treasurer respectively "of a subversive organization, to wit, the Southern Conference Educational Fund, said organization being essentially the same as the Southern Conference for Human Welfare, which said organization has been cited by committees of the United States Congress as a Communist front organization . . . ."

The statutory definition of "a subversive organization" in § 359 (5)[10] incorporated in the offense created by

[9] Section 364 (4) provides: "It shall be a felony for any person knowingly and wilfully to . . . [a]ssist in the formation or participate in the management or to contribute to the support of any subversive organization or foreign subversive organization knowing said organization to be a subversive organization or a foreign subversive organization . . . ."

[10] Section 359 (5) provides: " 'Subversive organization' means any organization which engages in or advocates, abets, advises, or teaches, or a purpose of which is to engage in or advocate, abet, advise, or teach activities intended to overthrow, destroy, or to assist in the overthrow or destruction of the constitutional form of the government of the state of Louisiana, or of any political subdivision thereof by revolution, force, violence or other unlawful means, or any other orga-

§ 364 (4), is substantially identical to that of the Washington statute which we considered in *Baggett* v. *Bullitt, supra,* at 362, 363, n. 1. There the definition was used in a state statute requiring state employees to take an oath as a condition of employment. We held that the definition, as well as the oath based thereon, denied due process because it was unduly vague, uncertain and broad. Where, as here, protected freedoms of expression and association are similarly involved, we see no controlling distinction in the fact that the definition is used to provide a standard of criminality rather than the contents of a test oath. This overly broad statute also creates a "danger zone" within which protected expression may be inhibited. Cf. *Speiser* v. *Randall,* 357 U. S. 513, 526. So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression. *A Quantity of Copies of Books* v. *Kansas,* 378 U. S. 205; *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58; *Marcus* v. *Search Warrant,* 367 U. S. 717; *Speiser* v. *Randall, supra.* Since § 364 (4) is so intimately bound up with a definition invalid under the reasoning of *Baggett* v. *Bullitt,* we hold that it is invalid for the same reasons.

We also find the registration requirement of § 364 (7) invalid. That section creates an offense of failure to register as a member of a Communist-front organization, and, under § 359 (3),[11] "the fact that an organization has

---

nization which seeks by unconstitutional or illegal means to overthrow or destroy the government of the state of Louisiana or any political subdivision thereof and to establish in place thereof any form of government not responsible to the people of the state of Louisiana under the Constitution of the state of Louisiana."

[11] Section 359 (3) provides: " 'Communist Front Organization' shall, for the purpose of this act include any communist action organization, communist front organization, communist infiltrated orga-

been officially cited or identified by the Attorney General of the United States, the Subversive Activities Control Board of the United States or any committee or subcommittee of the United States Congress as a . . . communist front organization . . . shall be considered presumptive evidence of the factual status of any such organization." There is no requirement that the organization be so cited only after compliance with the procedural safeguards demanded by *Anti-Fascist Committee* v. *McGrath, supra.*[12]

---

nization or communist controlled organization and the fact that an organization has been officially cited or identified by the Attorney General of the United States, the Subversive Activities Control Board of the United States or any committee or subcommittee of the United States Congress as a communist organization, a communist action organization, a communist front organization, a communist infiltrated organization or has been in any other way officially cited or identified by any of these aforementioned authorities as a communist controlled organization, shall be considered presumptive evidence of the factual status of any such organization."

[12] Although we hold the statute void on its face, its application to the National Lawyers Guild is instructive. In 1953, the Attorney General of the United States proposed to designate the organization as subversive. His proposal was made under revised regulations, promulgated under Executive Order 10450 to comply with *Anti-Fascist Committee*, establishing a notice and hearing procedure prior to such designation of an organization. 18 Fed. Reg. 2619; see 1954 Annual Report of the Attorney General, p. 14. The Guild brought an action in the District Court for the District of Columbia attacking the Executive Order and the procedures. A summary judgment in favor of the Attorney General because of failure to exhaust administrative remedies was sustained on appeal and this Court denied certiorari, *National Lawyers Guild* v. *Brownell,* 96 U. S. App. D. C. 252, 225 F. 2d 552, cert. denied, 351 U. S. 927. After a Hearing Officer determined that certain interrogatories propounded to the Guild should be answered, the Guild brought another action in the District Court, *National Lawyers Guild* v. *Rogers,* Civil Action No. 1738–58, filed July 2, 1958. On September 11, 1958, the Attorney General rescinded the proposal to designate the Guild. 1958 Annual Report of the Attorney General, p. 251. On September 12, 1958, the complaint

A designation resting on such safeguards is a minimum requirement to insure the rationality of the presumptions of the Louisiana statute and, in its absence, the presumptions cast an impermissible burden upon the appellants to show that the organizations are not Communist fronts. "Where the transcendent value of speech is involved, due process certainly requires . . . that the State bear the burden of persuasion to show that the appellants engaged in criminal speech." *Speiser* v. *Randall, supra,* at 526. It follows that § 364 (7), resting on the invalid presumption, is unconstitutional on its face.[13]

---

was dismissed as moot at the instance of the Attorney General, who filed a motion reciting the rescission and stating that the Attorney General had "concluded that the evidence that would now be available at a hearing on the merits of the proposed designation fails to meet the strict standards of proof which guide the determination of proceedings of this character." The present federal statutes provide that the Subversive Activities Control Board may not designate an organization as a Communist front without first according the organization the procedural safeguards of notice and hearing. Subversive Activities Control Act of 1950, § 13, 64 Stat. 998, 50 U. S. C. § 792 (1958 ed.). See *Communist Party* v. *SACB,* 367 U. S. 1.

[13] Although we read appellee Garrison's brief as conceding that appellants' files and records were seized in aid of the prosecutions under the Subversive Activities and Communist Control Law, we find no concession that the seizure, as alleged in appellants' offer of proof, was also under color of the Communist Propaganda Control Law. Section 390.6 of that statute authorizes the seizure and destruction on summary process of "[a]ll communist propaganda discovered in the state of Louisiana" in violation of the other provisions of the Act, and § 390.2 makes it a felony to disseminate such material. "Communist propaganda" is defined in § 390.1, which contains a presumption identical to that which we have found to be invalid in § 359 (3) of the Subversive Activities and Communist Control Law. In light of the uncertain state of the record, however, we believe that the appellants' attacks upon the constitutionality, on its face and as applied, of the Communist Propaganda Control Law should await determination by the District Court after considering the sufficiency of threats to enforce the law.

## III.

The precise terms and scope of the injunctive relief to which appellants are entitled and the identity of the appellees to be enjoined cannot, of course, be determined until after the District Court conducts the hearing on remand. The record suffices, however, to permit this Court to hold that, without the benefit of limiting construction, the statutory provisions on which the indictments are founded are void on their face; until an acceptable limiting construction is obtained, the provisions cannot be applied to the activities of SCEF, whatever they may be. The brief filed in this Court by appellee Garrison, District Attorney of the Parish of Orleans, the official having immediate responsibility for the indictments, concedes the facts concerning the arrests of the individual appellants, their discharge by the local judge, and the indictments of the individual appellants by the grand jury. In view of our decision on the merits, the District Court on remand need decide only the relief to which appellants may be entitled on the basis of their attacks on other sections of that statute and the Communist Propaganda Control Law, and on their allegations that appellees threaten to enforce both statutes solely to discourage appellants from continuing their civil rights activities. On these issues, abstention will be as inappropriate as on the issues we here decide.

The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion. These shall include prompt framing of a decree restraining prosecution of the pending indictments against the individual appellants, ordering immediate return of all papers and documents seized, and prohibiting further acts enforcing the sections of the Subversive Activities and Communist Control Law here found void

on their face. In addition, appellants are entitled to expeditious determination, without abstention, of the remaining issues raised in the complaint.

*It is so ordered.*

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE STEWART took no part in the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, dissenting.

The basic holding in this case marks a significant departure from a wise procedural principle designed to spare our federal system from premature federal judicial interference with state statutes or proceedings challenged on federal constitutional grounds. This decision abolishes the doctrine of federal judicial abstention in all suits attacking state criminal statutes for vagueness on First-Fourteenth Amendment grounds. As one who considers that it is a prime responsibility of this Court to maintain federal-state court relationships in good working order, I cannot subscribe to a holding which displays such insensitivity to the legitimate demands of those relationships under our federal system. I see no such incompatibility between the abstention doctrine and the full vindication of constitutionally protected rights as the Court finds to exist in cases of this kind.

In practical effect the Court's decision means that a State may no longer carry on prosecutions under statutes challengeable for vagueness on "First Amendment" grounds without the prior approval of the federal courts. For if such a statute can be so questioned (and few, at least colorably, cannot) then a state prosecution, if insti-

tuted after the commencement of a federal action,[1] must be halted until the prosecuting authorities obtain in some other state proceeding a narrowing construction, which in turn would presumably be subject to further monitoring by the federal courts before the state prosecution would be allowed to proceed.

For me such a paralyzing of state criminal processes cannot be justified by any of the considerations which the Court's opinion advances in its support. High as the premium placed on First Amendment rights may be, I do not think that the Federal Constitution prevents a State from testing their availability through the medium of criminal proceedings, subject of course to this Court's ultimate review.

Underlying the Court's major premise that criminal enforcement of an overly broad statute affecting rights of speech and association is in itself a deterrent to the free exercise thereof seems to be the unarticulated assumption that state courts will not be as prone as federal courts to vindicate constitutional rights promptly and effectively. Such an assumption should not be indulged in the absence of a showing that such is apt to be so in a given case. No showing of that kind has been made. On the contrary, the Louisiana courts in this very case have already refused to uphold the seizure of appellants' books. *Ante,* pp. 487–488. We should not assume that those courts would not be equally diligent in construing the statutes here in question in accordance with the relevant decisions of this Court.[2]

---

[1] If the state criminal prosecution were instituted first, a federal court could not enjoin the state action. 28 U. S. C. § 2283 (1958 ed.).

[2] Moreover, it is not unlikely that the Louisiana courts would construe these statutes so as to obviate the problems of vagueness noted by the Court in *Baggett* v. *Bullitt,* 377 U. S. 360, with regard to a similar Washington statute. Compare *Douglas* v. *City of Jeannette,* 319 U. S. 157, and *Murdock* v. *Pennsylvania,* 319 U. S. 105, *ante,* p. 485.

The Court suggests that "a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination." *Ante,* p. 486. But the possibility of such an impairment is not obviated by traveling the federal route approved here. Even in the federal courts the progress of litigation is not always as swift as one would like to see it. It is true, of course, that appellants would have to show in the state case that the conduct charged falls outside the scope of a criminal statute construed within constitutional limits, whereas in this case they need not allege the particular conduct which they deem to be protected. But the argument that these state prosecutions do not afford an appropriate vehicle for testing appellants' claims respecting freedom of speech and association hardly sits well with the Smith Act cases in which First Amendment claims were at the very core of the federal prosecutions. See *Dennis* v. *United States,* 341 U. S. 494; *Yates* v. *United States,* 354 U. S. 298; *Scales* v. *United States,* 367 U. S. 203.

*Baggett* v. *Bullitt,* 377 U. S. 360, in which the Court last Term struck down a Washington state statute virtually identical to this one, should not be dispositive of this case. *Baggett* was decided in the context of what amounted to an academic loyalty oath, applicable to college professors with respect to some of whom (those not having tenure) there was at least grave doubt whether a state remedy was available to review the constitutionality of their dismissal by reason of refusal to take the required oath. I would not extend the doctrine of that case to thwart the normal processes of state criminal law enforcement.[3]

---

[3] In this case appellants are pursuing a consistent course of conduct, and the only question is whether the Louisiana statutes apply

Had this statute been a federal enactment and had this Court been willing to pass upon its validity in a declaratory judgment or injunction action, I can hardly believe that it would have stricken the statute without first exposing it to the process of narrowing construction in an effort to save as much of it as possible. See, *e. g., Dennis* v. *United States, supra,* at 502. Yet here the Court has not only made no effort to give this state statute a narrowing construction, but has also declined to give the Louisiana courts an opportunity to do so with respect to the acts charged in the pending prosecutions against these appellants. See *Fox* v. *Washington,* 236 U. S. 273; *Poulos* v. *New Hampshire,* 345 U. S. 395. The statute thus *pro tanto* goes to its doom without either state or federal court interpretation, and despite the room which the statute clearly leaves for a narrowing constitutional construction. See *Dennis, Yates,* and *Scales, supra.* This seems to me to be heavy-handed treatment of the first order.

What the Court decides suffers from a further infirmity. Interwoven with the vagueness doctrine is a question of standing. In a criminal prosecution a defendant could not avoid a constitutional application of this statute to his own conduct simply by showing that if applied to others whose conduct was protected it would be unconstitutional.[4] To follow that practice in a federal court which

---

to such conduct. Thus, this case comes within the "bulk of abstention cases in this Court . . . [where] the unsettled issue of state law principally concerned the applicability of the challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation." *Baggett* v. *Bullitt, supra,* at 376–377. The present case is indistinguishable from *Harrison* v. *NAACP,* 360 U. S. 167, and *Albertson* v. *Millard,* 345 U. S. 242, as explained in *Baggett, supra,* at 376, n. 13.

[4] See Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 96–104 (1960).

is asked to enjoin a state criminal prosecution would, however, in effect require that the parties try the criminal case in advance in the federal forum, see *Cleary* v. *Bolger,* 371 U. S. 392; *Stefanelli* v. *Minard,* 342 U. S. 117, 123–124, a procedure certainly seriously disruptive of the orderly processes of the state proceedings. The Court seems to recognize that persons whose conduct would be included under even the narrowest reading of the statutes—what might be called "hard-core" conduct—could have been constitutionally prosecuted under the statutes invalidated today, without being able to assert a vagueness defense. *Ante,* n. 7; pp. 491–492. Thus, if persons were conspiring to stage a forcible *coup d'etat* in a State, they could hardly claim in a criminal trial that a statute such as this was vague as applied to them. For all we know, appellants' conduct in fact would fall within even the narrowest reading of the Louisiana Subversive Activities and Communist Control Law, but since appellants were able to reach a federal court before the State instituted criminal proceedings against them, they are now immunized with a federal vaccination from state prosecution. To make standing and criminality turn on which party wins the race to the forum of its own choice is to repudiate the "considerations of federalism" (*ante,* p. 484) to which the Court pays lip service.

While I consider that abstention was called for, I think the District Court erred in dismissing the action. It should have retained jurisdiction for the purpose of affording appellants appropriate relief in the event that the state prosecution did not go forward in a prompt and bona fide manner. See *Harrison* v. *NAACP,* 360 U. S. 167.